## Ratner v. Berger et al.

*Sidney Schulman,* for plaintiff.

..*Bertram I. De Young* and *Brown & Williams,* for defendants.

LEVINTHAL, J., May 6, 1941.—Complainant is a shareholder in the Homer Building & Loan Association. Respondents are: (1) The Homer Building & Loan Asso-

ciation (hereinafter called "Homer") ; (2) three Philadelphia banks which are borrowed money creditors of Homer, namely, the Central-Penn National Bank (hereinafter called "Central-Penn"), the Pennsylvania Company for Insurances on Lives and Granting Annuities (hereinafter·called "Pennsylvania Company"), and the Corn Exchange National Bank (hereinafter called "Corn Exchange") ; and (3) six individuals who are the liquidating trustees of Homer, namely, J. A. Berger, William M. West, W. Freeland Kendrick, Harry Gottlieb, Frank J. Gorman, and William Toll.

, Complainant's bill is brought on behalf of himself and all other shareholders of the same class and seeks to establish the prior rights of these shareholders to certain moneys, at one time deposited by Homer in "segregated" accounts with the respondent banks, as against the claims of these banks as creditors. The bill prays, inter alia: (1) For an accounting by the respondent banks which allegedly received payments from this fund; (2) for the repayment by them of the amounts so received;.(3) for an accounting by the respondent liquidators; and (4) for their surcharge for making such payments to the banks.

At the trial respondents moved to strike certain evidence from the record and, more significantly, to dismiss the bill. Decision on these motions having been reserved, they now give rise to the instant adjudication. . . .

## Discussion

.An extremely lengthy record in this proceeding accounts for the equally lengthy findings of fact. They are highly reflective of the character of complainant's case. Details of the activity and operation of the Homer Building & Loan Association, since its reorganization in 1930, have been brought to light in their multitudinous aspects in an attempt to reveal that complainant and other shareholders similarly situated have been inequitably treated by defendants, and complainant has endeavored to piece together a legal cause of action from all these manifold complicated circumstances.

The issues raised in the briefs of counsel and requests for conclusions of law are equally numerous, but many of them have no reasonable relation to the facts of the present case. We shall confine our discussion to those issues which merit consideration.

Complainant contends: (1) That the merger agreement, construed in the light of the surrounding circumstances, sustains the prior rights of free shareholders to dues paid in after April 10, 1930, as against the claims of the creditor banks; (2) that the shareholders' rights to priority must be enforced in conformity with the Deputy Secretary of Banking's segregation "order" of September 29, 1931; and (3) that the shareholders having been induced to continue payments of dues by Homer's promise to segregate and by its action in segregating these dues as a "trust" fund, upon which these free shareholders relied, respondents now are estopped to deny the "trust" character of the dues so paid. A possible fourth contention may be noted, namely, that, in any event, the creation of the segregated accounts with the respondent banks gave rise to a voluntary irrevocable trust of the moneys so deposited which could not thereafter be revoked without the consent of the shareholder beneficiaries.

Respondents, in addition to denying the validity of the foregoing contentions, affirmatively assert that the bill is barred by the statute of limitations and complainant's laches.

I. As to the merger agreement itself, we are unable to derive complainant's construction therefrom regarding the preferred or "trust" status of free dues paid in after April 10, 1930. Complainant does not point to any provision in the agreement withdrawing these dues from the general assets of the association liable for the claims of creditors. He does not indicate where the merger agreement provides that such dues, paid after April 10, 1930, are to be immunized from the claims of preëxisting creditors. On the contrary, reliance is placed upon the "surrounding circumstances" which, according to complainant, indicate that the merger arrangement was merely

one "designed to permit the association to continue and to liquidate its assets in an orderly way, with the hope of salvaging the greatest amount for creditors and shareholders".

If such were the facts, the inclusion of a provision in the merger agreement regarding new dues, such as that which complainant would now have us imply, would only have been fair and just. It is conceivable that some of the parties may have mistakenly thought that such a provision had been included. However, on the other hand, there is some reason to believe that, with the new management and the writing down of the old shares, it was contemplated generally that the association not only would be rendered solvent but that its continued operation as a going concern was assured. The subsequent events which tumbled Homer into the hands of the liquidating trustees do not justify the inference of bad faith on the part of those negotiating the merger. We cannot say that, at the time of the merger, it was apparent that new payments of dues would only amount to sending good money after bad.

We have examined the merger agreement with considerable care but are unable to discover any provision therein which would help complainant. The references to the new dues are chiefly those fixing their book value as against those previously paid. For this purpose, they were to be 100 percent dues. The merger agreement does not purport to immunize them against the claims of preexisting creditors. Creditors of old Homer continued as creditors of new Homer, and shareholders in new Homer were to be shareholders and nothing more. In fact, article V, sec. A, para. 3, provided that "Persons becoming stockholders of New Corporation may withdraw at any time, subject to the previous provisions hereof as to available funds, and shall receive such withdrawal value as is fixed by New Corporation according to law", which is some indication that a guaranty of segregation and full repayment, assumed by complainant, was not contemplated by the agreement of merger. In brief, we are un-

able to perceive any violation of the merger agreement in this case.

II. Nor do we believe that the shareholders' preference over the borrowed money creditors effectively can be predicated upon the Deputy Secretary of Banking's letters of September 29, 1931.

Section 20 of The Banking Act of June 15, 1923, P. L. 809, provided that orders by the Secretary of Banking should be issued "under his hand and seal of office". This was not done in the present case. Moreover, the letters did not purport to be a formal order but merely a request on the part of the deputy secretary (compare Blattenberger v. Sharswood B. & L. Assn., 19 D. & C. 447 (C. P. 4, Phila. Co., 1933) ), and they were received into evidence not as an official order but "for whatever light it may throw on the subsequent events".

It may be further observed that, prior to the Building and Loan Code of May 5, 1933, P. L. 457, there appears to have been no statutory authority in the Secretary of Banking to issue an "order of segregation". In particular, there appears to have been no authority in the deputy secretary to direct that the general assets of the association theretofore available for the payment of debts be diverted from creditor claims. The lack of statutory authority for a segregation order is conceded by complainant who argues, however, that a custom to this effect did exist. No evidence of this custom was offered at the trial and we cannot assume the fact. In any event, compliance with the formal requirements of the statute would have been necessary.

Had the request of the deputy secretary not been complied with, it is probable that steps would have been taken under section 21 of The Banking Act of 1923 to place the association in the possession of the Secretary of Banking, since the deputy secretary, properly or otherwise, apparently considered the failure to segregate as an "unsafe" practice. However that may be, the letters, of themselves, carried no legal compulsion and cannot be regarded as

creating rights in the shareholders which they would not otherwise have had. See Blattenberger v. Sharswood B. & L. Assn., supra, at p. 449.

III. Complainant argues also that respondents are estopped to deny the existence of a "trust" fund in favor of the new dues since they had been paid by shareholders in reliance upon Homer's promise and action in creating the segregated accounts.

The greater portion of the discussion in the briefs of counsel has been devoted to this point and much testimony has been taken in an effort to establish representations by Homer that dues paid in would not be charged with the preëxisting indebtedness of the association. The theories propounded appear to be those of equitable and promissory estoppel. On either theory, the instant proceeding cannot be viewed as a true class suit. Cf. Ayer v. Kemper et al., 48 F. (2d) 11 (C. C. A. 2d, 1931); Cherry et al. v. Howell et al., 4 Fed. Supp. 597 (E. D., N. Y. 1931). Whether or not a shareholder has a cause of action will depend entirely on whether representations have been made to *him* and whether *his* particular payments of dues were made in reliance upon these representations. It is evident that, in this regard, each shareholder must establish his own claim. Absent parties are not bound by the decree and cannot secure any benefit therefrom except that to be derived from the application of the rule of stare decisis. Joinder of free shareholders as parties complainants might have been effected under section 1 of the Act of June 25, 1937, P. L. 2072, 12. PS §159.1. In fact, it does appear rather strange that no other "wronged" free shareholder saw fit to join in complainant's bill. In any event, in this aspect of the case, we must consider solely the facts pertaining to complainant himself and not those relating to shareholders who are not parties of record.

The averment of paragraph 14 of the amended bill of complaint to the effect that the first letter of September 29, 1931, was read to the assembled shareholders on October 13, 1931, including complainant, which was not spe-

cifically denied in respondents' answers, appears to be the sole evidence in point. Otherwise, there is no testimony that, during the period relevant herein, complainant knew of the request for or creation of the segregated accounts. Complainant's own requests for findings of fact are silent on this issue. Moreover, the record is entirely devoid of any testimony to establish the fact that any payments of dues made by complainant after this date were made in reliance upon Homer's representations or action in segregation. It is highly probable that many, if not most, of the shareholders were totally unaware of the negotiations between the deputy secretary, Homer, and the respondent banks and continued their payments of dues only because they were anxious to preserve their rights to existing benefits. Whether or not this was the true situation in complainant's case is not clear from the record. In any event, it does not seem that complainant has established those facts necessary to create an estoppel in his favor.

IV. Finally, complainant may urge that the creation of the segregated accounts with the respondent banks amounted to voluntary irrevocable trusts which could not thereafter be revoked without the consent of the shareholder beneficiaries.

It is quite clear that it was in compliance with the deputy secretary's request that the segregated accounts were opened with the respondent banks. The account with the Pennsylvania Company was entitled "Homer Building & Loan Association, Trustee for Segregated Dues paid by Free Shareholders," and those with Central-Penn and Corn Exchange designated Homer as "trustee for free stockholders' accounts". Each bank had written a letter agreeing not to attach, appropriate, or apply the funds in the particular account with the bank. In addition, these letters stated: "This company will not be responsible for the application of funds in this account when checks are drawn against it by the officers named in the resolution of the Board of Directors of Homer Building & Loan Association passed September 29, 1931."

No case has been cited to us holding that the deposit of money in a bank account by one person as trustee for another, of itself, creates an effective voluntary irrevocable trust. The cases cited to the contrary by respondents all involve the so-called "tentative trust" which, of course, is revocable at the instance of the settlor: Scanlon's Estate, 313 Pa. 424 (1933). However, the tentative trust cases are obviously inapplicable here.

We are not to be understood as holding that such a voluntary irrevocable trust cannot ordinarily be thus created. However, other important considerations constrain us to the opposite conclusion in the present case. It seems obvious that the debtor Homer could not, by declaring itself trustee of its assets in favor of certain shareholders, thus deprive the creditor banks of their rights to secure satisfaction of their claims from these assets. Certainly, such a "trust" could not operate to defeat these claims, unless consented to by the respondent banks. And, considering, in particular, the interests of depositors in the respondent banks which might be injuriously affected thereby, such consent should have been clear and explicit. Specifically, in the present case, it should have appeared that each bank had expressly consented that all moneys deposited in segregated accounts for free shareholders, whether with that bank or elsewhere, were to be immunized from its claims as a creditor of the association. We are unable to derive such consent from the letters in evidence. Moreover, it is doubtful that a National bank lawfully could give its consent to such an arrangement operating to the detriment of its depositors.

It may be noted, in addition, that there appears to have been no action by the entire body of shareholders regarding the creation of these "trust" accounts, and it would seem that an attempt by the directors of Homer to create a so-called "trust" in favor of a particular class of dues payers would be improper.

In sum, we do not believe that the bill can be supported on this theory. . . .